UNITED STATES of America

v.

Ronald R. MOORE, Appellant.

UNITED STATES of America

v.

Perseval BRIGHT, Appellant.

Nos. 83–1278, 83–1279.

United States Court of Appeals,
District of Columbia Circuit.

Argued 1 Nov. 1983.

Decided 27 April 1984.

See also, 563 F.Supp. 354.

William J. Garber, Washington, D.C. (appointed by this Court), for appellant in No. 83–1278.

Richard Stern, Washington, D.C. (appointed by this Court), for appellant in No. 83–1279.

Bertrand Shipley Thomas, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before TAMM, WILKEY and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge MIKVA.

WILKEY, Circuit Judge:

The primary issue presented by this case is whether the admission of certain "bad acts" testimony was proper. Because we find that the trial judge's carefully considered admission of this testimony conformed fully with both the Federal Rules of Evidence and our prior cases, we affirm.

## I. FACTS

In the spring of 1982 appellant Ronald Moore met Robin Smith in a shopping mall. The two went out to dinner that night. The two agreed that Smith would leave her motel and move in with Moore.

Smith lived with Moore for a period of several weeks that spring. Because of her relationship with Moore, she was able to observe almost all facets of his home life. As she later testified at trial, that included witnessing several drug sales.[1] Smith testified that Moore's friend Perceval Bright was also involved in some of those drug transactions, principally as Moore's supplier of cocaine.[2]

Smith ultimately became disenchanted with Moore, and decided to profit from her special knowledge by turning paid police informant. She contacted the police, and offered to set up for an arrest a drug dealer who "was dealing large quantities of marijuana and had access to large quantities of coke."[3] The police apparently responded avidly to this offer, and a deal was soon struck.

The arrest was set for 8 June 1982. During the course of that day, Smith had three telephone conversations with Moore. In the first telephone call, Moore confirmed to Smith that he could obtain the drugs, using the code words "Herbie" for marijuana and "white girl" for cocaine:

SMITH: OK now, I need to know something, Ron.

MOORE: Yea.

SMITH: OK Is it definite you can get the Herbie.

MOORE: Yea.

SMITH: See Herbie, and will I see the your four white girl friends today.

MOORE: Yea.[4]

In a subsequent telephone call, Smith and Moore established that the price would be $6,000 for four ounces of cocaine, and approximately $355 to $365 per pound for 30 pounds of marijuana.

MOORE: Ok well it is, you know what I am talking about it is going to cost you six.

SMITH: OK.

MOORE: You get four.

SMITH: OK You know your girl she weighs an ounce right

MOORE: Yes, she does that what I'm saying

\*   \*   \*   \*   \*   \*

MOORE: And the other, still wants 30 right.

SMITH: Yea.

MOORE: OK they're going to cost him um.

SMITH: Oh now let me tell you about that.

MOORE: Go ahead.

SMITH: He feels as if for 30 he should get a break on those tickets, you know the 30 tickets, for at least $3.55 or 50¢ at the most.

MOORE: $3.55

SMITH: Yeah or 50¢ at the least

MOORE: Tell him—OK

SMITH: Yeah

MOORE: That the best I can do—will accept half that—the best I can do possibly do is three-sixty five.[5]

Following several more telephone conversations between Moore and Smith, Moore

---

1. Trial Transcript at 187–201.

2. *Id.* at 191–92, 196.

3. *Id.* at 202.

4. Brief and Appendix for Appellee, Appendix A at 1. The transcripts of the tape recordings are replete with grammatical errors. Rather than burden the reader with the overabundance of "sic's," the transcripts are presented verbatim.

5. *Id.* at 3–5.

and Bright ultimately arrived at Smith's hotel room. The subsequent conversations in the room were tape-recorded through a hidden microphone. At the hotel room, Smith introduced the two appellants to Metropolitan Police Detective Ronnie Hairston, who told them he was a drug dealer from Virginia. After Hairston explained that his Virginia suppliers had been dry, Moore and Hairston quickly began discussing the quality of the drugs Moore was offering to sell. The two then reached apparent agreement on $360 a pound as the price for the marijuana, then entered a dispute as to the price of the cocaine. Hairston insisted that the price was "four ounces for six," [6] but Moore and Bright claimed that price had not been set.[7]

Moore, Bright and Hairston then resumed discussions:

BRIGHT: You want to do business? We're going to do business.

HAIRSTON: Well, O.K. so far.

BRIGHT: First of all, you got to be. You got the money, right? ... All you got to do is bring the money and pick up the package.

*   *   *   *   *   *

BRIGHT: You want to do some business? You serious about doing business?

MOORE: The thing is, do you want good coke, or did you want some bullshit? [8]

Faced with the price increase, Hairston canceled the marijuana deal, but agreed to purchase the cocaine.[9] The three then began a discussion of logistics:

BRIGHT: You bring your money to my spot, to our spot rather, to our neutral place.

HAIRSTON: We can't. We can't, in other words, [pause] What I'm saying is that that's a lot of money. [unintelligble]

MOORE: That's a lot of coke. It's a lot of coke.

*   *   *   *   *   *

HAIRSTON: I can understand you, but you got to understand me too.

BRIGHT: We're trying to understand you.

SMITH: Where are you all planning on going?

BRIGHT: Where we're going ain't your business. · We ain't trying to go to jail. [pause]

HAIRSTON: Fine.

BRIGHT: We ain't said nothing, right, now that could send us to jail. I don't know you. None of us don't know each other well enough that I can do my business right now.

HAIRSTON: Alright, uh-huh. So the deal is she'll pick up the package. When can we do it?

MOORE: She can get it now.

BRIGHT: We're going to put it in motion now. You understand? I ain't going in motion until I see the money [unintelligible] and [unintelligible]. When it get in motion, then we'll tell you exactly how long for you to have the money in a certain place and how.

HAIRSTON: Alright, well let's try it again, man. I have no—you got the upper hand. You got the dope?

BRIGHT: Let's see the money you got right there. That's the money you're buying with? [10]

Bright then insisted on inspecting the money Hairston had brought with him. After a brief inspection, he called Moore over to inspect the bills also:

BRIGHT: Hold it [the money] up to the light.

HAIRSTON: What's wrong with it?

MOORE: [unintelligible] to the light.

BRIGHT: Hold it up to the light. Turn it on the other side. Other side. That

---

6. Brief and Appendix for Appellee, Appendix B at 3.

7. *Id.* at 6.

8. *Id.* at 7.

9. *Id.* at 9.

10. *Id.* at 10–11.

one you had in your hand, turn this one to the other side. Look.

\* \* \* \* \* \*

I don't want to do no business with that turkey.[11]

Moore and Hairston then left the hotel room without concluding the drug deal. Before leaving, Moore apparently indicated to Hairston that they didn't want to do business because the money was "marked."[12] After they left, Hairston reexamined the money and concluded that it had been dusted for fingerprints.[13]

Even though no deal was concluded, the government proceeded to arrest Bright and Moore as they left the scene in Bright's truck. A gun and very small amounts of marijuana and hashish were retrieved from Bright's truck. Both their homes were searched, and a somewhat larger amount of marijuana was recovered from Moore's apartment. No drugs were recovered from Bright's home. The two men were subsequently charged with conspiracy to sell cocaine, and a variety of other offenses related to the possession allegations.[14]

Before trial, the government informed the court and the parties that it intended to employ testimony from Smith detailing the appellant's prior drug dealings in order to "provide the setting" for the crime.[15] The attorneys for Moore and Bright objected strenuously.[16] The government established that the testimony would be used to prove intent,[17] and to rebut an entrapment defense which Moore proposed to raise.[18] The judge duly noted the objections, but ruled that the bad acts testimony was ad-

missible.[19] Smith then testified at trial at some length about the defendants' prior drug dealings,[20] before proceeding to testimony involving events on the day of the aborted drug sale.[21]

Both defendants then presented defenses which directly attacked the issue of whether they had the necessary intent to engage in drug dealings. Moore acknowledged that the transaction in the hotel room resembled—and was intended to resemble—a bona fide drug sale, but claimed it was in fact merely a scam devised by Smith to dupe the would-be purchaser. According to Moore, he believed the deal would lead only to Smith's departing with the would-be purchaser's money, part of which she would then use to repay her debts to Moore.[22] Bright, on the other hand, claimed that he knew nothing about any drugs. As his attorney argued to the jury, Bright was along simply as a good Samaritan who had given Moore a ride, and when "things [in the hotel room] just didn't add up to what he had been told ... the only thing he wanted to do was get out of there."[23]

At the close of trial, the trial judge again held that the bad acts testimony would be considered admissible.[24] The attorneys for Moore and Bright chose not to seek a limiting instruction forbidding the jury to use the bad acts testimony for impermissible purposes.[25] As their counsel candidly explained at oral argument, the decision not to seek the limiting instruction was a tactical choice made in order to avoid reinforcing the damaging impact of the bad acts

11. *Id.* at 14.

12. *Id.* at 15.

13. *Id.*

14. Original Record on Appeal at 26.

15. Trial Transcript at 6.

16. *Id.* at 9, 12–14.

17. *Id.* at 11.

18. *Id.* at 8.

19. *Id.* at 12.

20. *Id.* at 185–201.

21. *Id.* at 208–28.

22. *Id.* at 601–16.

23. *Id.* at 642–43.

24. *Id.* at 710.

25. *Id.* at 753–55.

testimony.[26] The jury then convicted the defendants on the conspiracy charge, and acquitted on all others.[27] This appeal followed.

## II. ANALYSIS

■ A court considering whether to admit bad acts testimony must undertake a two-part analysis. First, the court must inquire whether the testimony is relevant under the standards set in Federal Rule of Evidence 404(b).[28] Secondly, if the court finds the testimony relevant, it must determine under Federal Rule of Evidence 403 whether the prejudicial impact of the testimony substantially outweighs its probative value.[29] In this case, the bad acts testimony was highly relevant to disputed issues, and its probative value outweighed any unfair prejudice.

### A. *Relevance of the Bad Acts Testimony*

The first step in deciding whether bad acts testimony should be admitted is determining whether the testimony is relevant. The Federal Rules of Evidence provide unusually precise guidance in this area, with

Rule 404(b) being "a specialized rule of relevancy."[30] Rule 404(b) specifies a particular use for which bad acts evidence is not admissible—proving that the defendant has a general predisposition to commit crimes—but the same rule also specifies several uses for which bad acts testimony can be admitted.[31] The testimony at issue here could properly have been admitted under at least two of these uses: to rebut a defense of entrapment, or to prove that the defendant had the necessary intent to commit the crime.

The government had the burden of proving intent. Under Rule 404(b), bad acts testimony can be introduced in order to prove intent,[32] and the government specified before trial that this was one use for which the bad acts testimony would be used.[33] The testimony offered by Smith proved to be very relevant on the issue of intent. At a minimum, it set a context which enabled the jury to evaluate whether the defendants were in fact "willing and able" to proceed with the drug sale. Especially given Bright's claim that he was in the hotel room simply because of a horrible

---

**26.** *See* TAN 51–58.

**27.** Each was sentenced to three years incarceration. Original Record on Appeal at 31–32.

**28.** Federal Rule of Evidence 404(b) reads:
*(b) Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**29.** Federal Rule of Evidence 403 reads:
*Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time*
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**30.** *See* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* 404–49. The authors of the same treatise provide a useful summation of the thrust of the rule:

The fact that a defendant committed another crime may be relevant to a wide variety of consequential facts, material propositions, depending on the kind of circumstantial steps with which it is used. Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question. Rule 404(b) which admits evidence of other crimes, wrongs or acts for purposes other than to show that a person acted in conformity with his character is not an exception to Rule 404(a) since Rule 404(a) does not apply when criminal propensity is not used circumstantially as the basis for inferring an act.
*Id.* at 404—45–46.

**31.** The uses specified in the rule are not meant to be exhaustive, but merely illustrative.

**32.** *United States v. Childs*, 598 F.2d 169 (D.C.Cir. 1979); *United States v. Anderson*, 509 F.2d 312, 328–29 (D.C.Cir.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975).

**33.** Trial Transcript at 11.

mistake, and Moore's claim that there was no intent to sell drugs, the judge acted absolutely properly in allowing the jury to have the benefit of this evidence.

The bad acts testimony was also relevant to the defense of entrapment raised by Moore. In raising the entrapment defense, Moore essentially argued that the government action constituted the origin and inducement of the crime.[34] It is obviously easier for an entrapment defense to succeed if the persons entrapped had previously led blameless lives and had no knowledge of the type of iniquity made the subject of the entrapment. The government had the right to rebut Moore's claim that he had no predisposition to commit the crime charged, and the bad acts testimony was directly relevant to this rebuttal.

The government thus fully carried its burden under Rule 404(b). Prior to trial, it identified at least two purposes for which the bad acts testimony would be used. These purposes were legitimate under the

rule. The government then produced an *eyewitness* who testified to *specific acts* of drug use and drug dealing. This was clear and convincing proof to support a jury finding that the bad acts alleged had in fact occurred. Finally, *the bad acts alleged* — a pattern of drug possession and drug dealing taking place immediately before the conspiracy alleged in the indictment— *clearly relate logically to the offense charged.* This was not a case where the bad acts were remote in time,[35] or of a fundamentally different nature.[36] In presenting the evidence of the defendants' drug dealings, the government produced forceful evidence that the defendants possessed the necessary ability and desire to sell drugs a scant few days later.

### B. *Unfair Prejudice*

■ Not all relevant evidence is admissible. Relevant evidence may be excluded under Rule 403 "if its probative value is substan-

**34.** *See* 2 D. Louisell & C. Mueller, Federal Evidence 129.

**35.** This case is thus readily distinguishable from *United States v. Foskey,* 636 F.2d 517 (D.C.Cir. 1980). In *Foskey,* the defendant had been arrested two-and-one-half years earlier for possession of drugs. At the time of the prior arrest, however, Foskey's companion had immediately asserted that he, and not Foskey, owned the drugs. No charges ever were placed against Foskey. On those facts, the exclusion of the prior arrest was clearly proper. The fact that Foskey had once been in the same room as a man who possessed illegal drugs was of minimal probative value to begin with, and the passage of time had further diluted any probative effect. In this case, by way of sharp contrast, the acts testified to by Smith were part of a series of actions by Moore and Bright leading to their arrests, and were of high probative value.

**36.** This case also can be readily distinguished from *United States v. Shelton,* 628 F.2d 54 (D.C. Cir.1980). In *Shelton,* the defendant was charged with assaulting a federal officer. The government, through cross-examination, "sought to persuade the jury that the defendant and one of his principal witnesses were members of the drug underworld involved in all sorts of skullduggery." *Id.* at 57. In that case, unlike this case, the evidence was properly excluded under Federal Rule of Evidence 404(b) because it was not relevant to the crime

charged. The court's opinion makes it perfectly clear that the government lawyers—unlike the government attorneys in this case—did not specify any reason as to why the evidence was relevant under Rule 404(b):

> The government does not seek to justify the prosecutor's line of cross-examination under one of the exceptions contained in Federal Rule of Evidence 404(b). It does not contend that the evidence produced established "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Moreover, the government did not seek a ruling from the trial court that the evidence was "necessary," and it did not obtain a preliminary finding that there was "clear and convincing evidence" to connect Shelton to the activities imputed to him by innuendo.

*Id.*

In the case before this court, the issue of relevance under Rule 404(b) was raised to the trial judge before the evidence was presented. The trial judge heard argument as to whether the evidence fit under one of the exceptions to Rule 404(b), and by admitting the evidence effectively and properly ruled that it passed muster under the standards set forth by that rule. This case thus differs markedly from *Shelton,* where the introduction of the evidence through cross-examination without prior notification precluded the trial judge from excluding it, and where no argument was made that the evidence fit under one of the exceptions to Rule 404(b).

tially outweighed by the danger of unfair prejudice...." [37]

The language of this rule tilts, as do the rules as a whole, toward the admission of evidence in close cases.[38] In prior cases, this court has set forth a rule of thumb for applying the prejudice leg of Rule 403. "In determining whether 'the probative value is *substantially* outweighed by the danger of *unfair* prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." [39]

### 1. Probative Value

The bad acts testimony in this case was highly probative on the intent issue. The bad acts alleged could hardly have a closer relationship to the offense than they do. The acts described by Smith all took place within a few weeks immediately prior to the defendants' arrests. The acts detailed included conversations between Moore and

Bright about their drug business,[40] cocaine transactions,[41] suspicious middle-of-the-night visits apparently related to drug transactions,[42] marijuana transactions,[43] and observation of high quality drugs around Moore's residence.[44] Each and every one of those acts bears a close relation to the offense charged, which required proof of the appellants' willingness to provide drugs.

The probative value of the testimony is further underscored by the fact that Smith was an eyewitness to the acts detailed. The jury was not required to pursue a complex chain of inferences arising from circumstantial evidence, nor was Smith unsure about what she saw. So long as the jury believed Smith, the only additional inference they needed to make was that the defendants' willingness to trade drugs had not dissipated in the few days between the prior deals and the aborted sale to Hairston.[45]

---

**37.** FRE 403.

**38.** *See* J. Weinstein & M. Berger, Weinstein's Evidence 403—26-27.

**39.** *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir.1978) (emphasis in original); *United States v. Harrison*, 679 F.2d 942, 948 (D.C.Cir.1982).

**40.** Trial Transcript at 187.

**41.** *Id.* at 188–89.

**42.** *Id.* at 190–92, 196.

**43.** *Id.* at 196.

**44.** *Id.* at 227. Nor, aside from the one reference to the "rock" of cocaine at Moore's house (used to explain which cocaine Smith believed Moore to be speaking about) was the prior bad acts testimony interspersed in a shotgun manner through Smith's testimony. On direct examination, her testimony proceeds in rough chronological order. She first discussed what she did in the Washington area prior to meeting Moore, Transcript at 180–83, then proceeded to her initial meeting with Moore, *id.* at 183–84, then proceeded to moving in with Moore, *id.* at 184–85, then discussed Moore's lifestyle while she lived there, including his drug use and dealings, *id.* at 185–201, then proceeded to her initiation of negotiations with the police, *id.* at 201–07, and only then proceeds to her testimony as to the aborted drug deal, *id.* at 208–28.

The cross-examination was somewhat more random in its treatment of the bad acts testimony. However, it would be a new departure in the law to hold that a criminal defendant should get a new trial because he prejudiced himself during cross-examination.

**45.** The dissent urges that the testimony by Smith was too "vague" to be believed, and hence has no probative value. In urging this, the dissent apparently believes that the appropriate test is whether the court on appeal is convinced by the testimony at issue.

The dissent's approach would improperly invite appellate courts—who must rely solely on a paper record, and have no opportunity to observe the witness—to invade the province of the trial judge and jury. The assessment of the credibility of a witness is primarily a matter for the trial judge and jury.

Appellate courts should limit themselves to examining whether the *type* of evidence is sufficiently probative. In this regard, trial courts should proceed from the premise that the jury believed the witness. The appellate court may then ask whether the testimony, accepted as true, sufficiently advances the inquiry to offset any unfair prejudice. In this respect, the appellate court looks primarily to whether the evidence relates closely to the purpose for which it was admitted, or merely plays a very attenuated—albeit marginally relevant—role in completing a complex chain of inferences. In this respect, the appellate court may consider whether the testimony involves eyewitness observation

## 2. Unfair Prejudice

The risk of unfair prejudice in this case is minimized because the only obvious use for the bad acts testimony is the proper use. The heart of the government's case was the presentation of tape recordings of the defendants engaging in what appeared to be a drug transaction. The defendants argued, in essence, that they only *appeared* to be engaging in a drug transaction. In that context, the obvious use of the bad acts testimony is the use for which it was admitted—to show intent.[46] It goes to show, first and foremost, that the dramatic drug transaction captured in the audio tapes was what it appeared to be. It shows that the defendants quite likely intended to follow through with their drug deal.

Any tangential chance that the jury could have misused the bad acts testimony could have been minimized—and, on the facts of this case, effectively eliminated—through the use of a limiting instruction.[47] The prosecution proposed such a limiting instruction.[48] The judge did not give it only because the defense lawyers affirmatively exercised their right to block it.[49]

Given the role of the defense in blocking the limiting instruction, this court should only look to that prejudice which would have accrued despite the giving of a proper limiting instruction. On the facts of this case—where the evidence was not relevant to any other convictions, where it was not materially relevant to any element of the conspiracy charge besides intent, and where it was highly probative on the appropriate issue of intent—there is no unfair prejudice.[50] The bad acts testimony per

---

or merely circumstantial evidence, whether the events witnessed were recent or so dated as to be of little probative value, and whether the witness testified that the events actually happened or only might have happened. Here, an eyewitness testified to recent events of a substantially similar nature that she had personally observed. If the jury believed Smith's testimony, they had little reason to doubt that Moore and Bright had the necessary intent to follow through on the aborted drug deal.

**46.** Even without a waiver by the defendants, this case is not one that would have required the judge to propose *sua sponte* a limiting instruction. In *United States v. Childs,* 598 F.2d 169 (D.C.Cir.1979), the only real issue in dispute was the intent of the defendants. The court there held that no limiting instruction was needed since the bad acts evidence would be used to a proper purpose—establishing intent.

The same could be said of this case. The tapes rendered any dispute as to the defendants' conduct moot; the issue controlling culpability was whether the defendants had the necessary intent to deal drugs. Under the rule of *Childs,* no limiting instruction would be necessary.

**47.** *See, United States v. Fench,* 470 F.2d 1234, 1241 (D.C.Cir.1972), *cert. denied sub nom. Blackwell v. U.S.,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973).

In some cases, of course, a limiting instruction would not suffice to avoid unfair prejudice caused by the introduction of bad acts testimony.

**48.** Original Record on Appeal at 30; Trial Transcript at 753.

**49.** Trial Transcript at 754–55. This court recently reviewed its approach to the role of limiting instructions when bad acts testimony is used. In *United States v. Lewis,* the court observed:

> [A] simple scheme ... allocates the responsibility for guarding against the misuse of evidence by a jury between trial court and trial counsel. During trial, counsel fairly bears the heavier burden of guarding against the misuse of evidence. Trial counsel must generally request a limiting instruction whenever potentially inflammatory evidence can be put to an improper use; reversible error arises if the court fails to grant such a request. The court must give such an instruction *sua sponte* only if the evidence has the potential for substantially prejudicing the defendant. Before giving the instruction, however, the court must offer defense counsel the opportunity to waive it. Failure to give defense counsel this opportunity also constitutes reversible error. 693 F.2d 189, 197 (D.C.Cir.1982) (footnotes omitted).

**50.** The government also acted to limit any damage that might arise from improper use of the bad acts testimony. Although the defendants had blocked the use of a limiting instruction, the government attorney in her closing argument did clearly specify that only the acts named in the indictment—and not other bad acts such as those testified to by Smith—formed the basis of the indictment:

> MS. SOKOLOW: Ladies and gentlemen, the indictment that you will have before you reflects all the criminal activity that occurred with regard to the June 8, 1982 drug deal that never went down.

haps was effective and probative, but it was appropriately and fairly effective and probative.

### 3. Unfair Prejudice and Probative Value

The bad acts testimony in this case would seem to be fully admissible under the standards established in our prior cases. The eyewitness testimony concerning recent acts was not only relevant but highly probative. No unfair prejudice was likely, in that the natural use of the testimony would be for its appropriate use, proving intent. To the extent that any minimal chance existed that the testimony could be misused that possibility could have been avoided through the limiting instruction proposed by the government.

The district judge was able to rely on more, however, than mere extrapolation from the rule. Barely six months before the trial in this case a panel of this court issued an opinion which set forth facts almost identical to those here. In *United States v. Harrison*,[51] the witness testifying to bad acts was the defendant's wife. As in this case, she was able to witness the prior bad acts because she lived with the defendant. As in this case, those bad acts included drug sales and the storing of drugs at the house. As in this case, she

was apparently the only eye witness willing to testify. As in this case, her allegations were confirmable only by circumstantial proof such as the subsequent discovery of drugs and drug paraphernalia at the house.[52]

This court made short shrift of the defendant's claim that such bad acts testimony was inadmissible. The court's conclusion, as the trial court here might well have observed, applies fully to the case at hand:

> Here, the testimony undeniably concerned "evidence ... close[ly] rela[ted] to the offense charged," and there is nothing "unfair" in admitting direct evidence of the defendant's past acts by an eyewitness thereto that constituted substantive proof of the relevant intent alleged in the indictment. The intent with which a person commits an act on a given occasion can many times be best proven by testimony or evidence of his acts over a period of time prior thereto, particularly when the activity involves a continuous course of dealing.[53]

No two cases are, of course, precisely identical, and some minor differences can be identified between *Harrison* and the case at bar. The most important of those distinctions cuts for, rather than against, admitting the evidence. Harrison did not argue entrapment,[54] and so one powerful

---

Trial Transcript at 825.

The bad acts otherwise were not mentioned in closing argument. This case is thus readily distinguishable from *United States v. DeLoach,* 654 F.2d 763, 772 (D.C.Cir.1980) (Tamm, J., concurring), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981), where the government in closing argument implied that the prior bad acts were a sufficient basis for conviction. In explicitly stating that only those acts charged in the indictment could support a conviction, the government went as far as it could to heed the admonitions of *DeLoach.*

**51.** 679 F.2d 942 (D.C.Cir.1982).

**52.** In addition to the marijuana allegedly found at Moore's house, police also found a scale suitable for weighing drugs. Moore testified at trial that the scale had no relationship to the marijuana found in his home, but instead had been bought several years before so that he could gradually and precisely reduce his meat consumption in an effort to become a vegetarian.

**53.** 679 F.2d at 948.

**54.** This court's opinion in *Harrison* nowhere indicates that the defendant in that case raised an entrapment defense.

The opinion in *Harrison* also suggests other distinctions between that case and this one. In *Harrison,* discrepancies apparently existed between various recountings by Mrs. Harrison of her husband's drug dealings; in addition, two of the witnesses she named as possible customers denied participating in or even witnessing drug sales by Harrison. *Id.* at 948–49. (The *Harrison* opinion fails to show that Mrs. Harrison accurately named any names). The fact remains, however, that the two cases are substantially alike. In both cases, eye witnesses testified to what they had personally seen; in both cases, the type of activity witnessed was directly relevant to the intent issue. Neither case involved circumstantial evidence which would require piling inference upon inference; both cases required only that the jury believe that the witness saw what she said she saw.

justification for admitting the evidence was not present in that case.

■ The trial court thus appears to have acted entirely properly in this case. It properly ascertained before trial that the proffered evidence would be relevant for a legitimate purpose under Rule 404(b). It then followed this court's recent, controlling statement that evidence of past acts proving intent is not unfairly prejudicial within the meaning of Rule 403. The admission of the evidence was thus fully proper under the rules.

### III. Conclusion

Given the wide discretion granted trial judges in applying Rules 403 and 404(b), and given this court's normal deference to prior precedent, the trial court's straightforward application of the rule and the directly applicable case law was not error. The judge simply applied the law according to the guidelines set by this court.[55]

For the foregoing reasons, the judgments of the district court are

*Affirmed.*

MIKVA, Circuit Judge, dissenting:

Because I cannot subscribe to the majority's misapplication of the Rules of Evidence, I dissent. I would hold that the nebulous nature of the testimony concerning the prior drug transactions and the tenuous link that the evidence in question bore to the crime for which Moore and Bright were charged, combine to make it error to have admitted the evidence. This result is required by the Federal Rules of Evidence. Indeed, to me this is the classic case of the inadmissibility of prior "bad acts" testimony.

As an initial matter I am impelled to lodge my discomfort with the tenor of the majority opinion. The majority opinion goes to great lengths to convince the reader of the defendants' guilt, placing emphasis on the defendants' familiarity with the lexicon of narcotics and on the circu̲ es of the alleged, aborted sale. The n̲ ty even tries to assign sinister significance to a kitchen scale. *Majority Opinion* at 991 n. 52. It is difficult for me to understand the import and relevance that this orientation to microscopic details has to an analysis of whether the "bad acts" evidence is admissible. The only logical conclusion I thus can draw is that the majority would like to adopt a new doctrine of evidence: when *defendants* are "guilty of something" and are generally nefarious characters, any evidence tending to show their guilt is admissible. The majority may not accept the parentage for such a dogma, but the rhetoric leads to such a result ineluctably.

### I. Factual Background

Less than a week before defendants were arrested, one Robin Smith contacted police, told them that defendant Moore was selling drugs, and offered to arrange a meeting between the police and Moore. Smith, who had been living with Moore for several weeks prior to the police tip, recently moved out of Moore's house after a domestic argument. Smith's only prior experience as an informant for the police occurred a few days earlier, when she volunteered to arrange another drug-related "set-up" unrelated to the instant case or to the defendants here.

The day after Smith called the police concerning Moore, the police authorized Smith to arrange a drug deal between Moore and an undercover police officer. That officer was to buy four ounces of cocaine and thirty pounds of marijuana from Moore. Over the next three days, Smith and Moore discussed sales price, quality of the drugs, and the date of the sale. On the fourth day, Smith telephoned Moore from police headquarters to finalize arrangements for the scheduled sale. The sale was to occur that evening in Smith's motel room. During these recorded tele-

---

**55.** We have also carefully considered the contentions by defense counsel that the evidence was insufficient to support a conviction, and that the evidence seized from Moore's home should have been suppressed, and find those arguments without merit.

phone calls, Moore agreed to sell the requested amount of cocaine and marijuana to Smith's friend for $19,000.

As planned, Smith, Moore, and an undercover police officer met at the motel later that evening. Moore was accompanied by the co-defendant Perseval Bright. After a brief discussion of the sales price, Bright asked to see the money. Upon inspection, Bright alerted Moore to the abnormally "dusty" appearance of the money. Moore and Bright then announced that the deal was off and left together. The entire conversation in Smith's room was monitored and recorded by the police through listening devices situated in an adjoining room.

Moore and Bright were apprehended in Bright's truck 500 feet from the motel and arrested. The police recovered a small envelope containing marijuana from Bright's pants pocket, and a plastic bag containing a small quantity of marijuana, a small piece of hashish, and a gun from the truck.

The following day, warrants to search Moore's home and Bright's residence were issued and executed. During the search of Moore's home, police confiscated a full brick of marijuana (approximately 2 lbs.), a partial brick, several bags of marijuana, and a scale. Nothing was recovered during a partial search of Bright's home. In fact, *no cocaine or money was discovered during the entire course of this investigation.*

At the trial's opening, prior to jury selection, the prosecution announced its intention to introduce evidence of Moore's and Bright's alleged prior drug dealing, through testimony by Smith, to provide the "setting" for the crime, as proof of defendants' intent to conspire to distribute narcotics, and to rebut any defense of entrapment. Defendants objected to the admission of this evidence and requested a ruling on the necessity of the evidence to the prosecution's case. The judge ruled that the evidence, which consisted solely of Robin Smith's earlier observations of alleged drug transactions involving Moore and/or Bright, was admissible.

Smith then testified, over defense objections, to earlier drug transactions that she allegedly had witnessed. This testimony was interspersed with her testimony concerning incidents directly related to the indictment. At no time during the course of the trial, either as the evidence was admitted or at the trial's end, was the jury instructed as to the limited purpose for which the prior bad acts testimony was being admitted.

## II. DISCUSSION

Under the Federal Rules of Evidence, two rules provide the framework within which the admissibility of prior bad acts testimony must be considered. Such testimony must first satisfy Rule 404(b), which addresses the limited set of purposes for which prior bad acts testimony is deemed relevant. Even if relevant, however, evidence that a defendant has committed prior bad acts is likely to be prejudicial, for juries may be tempted to use evidence of previous transgressions as the basis for convicting a defendant of the crime for which he is charged. *United States v. Shelton,* 628 F.2d 54, 56 (D.C.Cir.1980). As a result, relevant prior bad acts testimony must also cross the hurdle of Rule 403, which requires the trial judge to exclude evidence

> if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....

FED.R.EVID. 403. These rules must be applied in tandem to determine whether evidence that defendants have committed prior bad acts is admissible in a criminal case. Rule 404(b), the starting point for the analysis, provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

FED.R.EVID. 404(b). Satisfaction of the "other purposes" clause of 404(b) requires more than the prosecutor's assertion that the evidence of defendant's prior bad acts is offered under one of the excepted categories. *United States v. Ring*, 513 F.2d 1001, 1004 (6th Cir.1975). To fit within a category, the prosecutor initially must demonstrate that the limited purpose for which the evidence is offered is a material fact in dispute and that the evidence is relevant to establish the existence of this fact. To be relevant, evidence must have the tendency to make "the existence of [the fact] ... more probable or less probable than it would be without the evidence." FED.R. EVID. 401. To be deemed relevant under 404(b), evidence of prior bad acts also must be linked adequately to the crime charged. At a minimum, this requires that the prior bad acts be similar to the offense for which the defendant is charged. Moreover, when introduced to prove intent, the *intent* to commit both the prior bad acts and the offense charged must be substantially similar. *See, e.g., United States v. DeLoach*, 654 F.2d 763, 769 (D.C.Cir.1980), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 209 (1981); *United States v. Foskey*, 636 F.2d 517, 524 (D.C.Cir.1980). Equally important, the evidence that connects the defendant to the alleged prior bad acts must be stronger than mere speculation. *United States v. Shelton*, 628 F.2d 54, 57 (D.C.Cir.1980).

At the pretrial motion, the prosecutor sought to meet the burden of 404(a) by indicating that the prior acts evidence would be introduced to establish, *inter alia*, the defendants' intent to commit the crime. Intent was an issue needing proof, and the testimony of Smith, however tangential, could have some relevance to defendants' intent to commit the crime under the indictment.

Even if the evidence is found admissible under 404(b), the trial court still must apply the balancing test set forth in Rule 403. This Rule requires the trial court to balance the "probative value of and need for the evidence against the harm likely to result from its admission." FED.R.EVID.

403 Advisory Committee Note. By definition, this balancing is fact specific and will vary from case to case. Moreover, because the Rule 403 balancing is a matter within the discretion of the trial court, an appellate court will overturn the trial court's balancing only where discretion has been abused. *Miller v. Poretsky*, 595 F.2d 780, 783 (D.C.Cir.1978); *United States v. Day*, 591 F.2d 861, 878–79 (D.C.Cir.1978).

Assuming that the evidence presented in this case survives the Rule 404(b) inquiry, I believe that it was an abuse of discretion to admit the prior bad acts evidence because the prejudice associated with the testimony so clearly outweighs any probative value it might have had. The initial focus is that part of the balance that addresses the probativeness of the proffered evidence. The record here revealed testimony that was noteworthy only for its vagueness and countless incidents of selective recall. Smith's testimony concerning Moore's and Bright's prior "drug transactions" was very unspecific and contained so many gaps that the degree to which it was probative of any element in the indictable offense borders on the insignificant.

Not once did Smith recall the name of any person involved in the alleged drug transactions, the dates of the transactions, or even the number of transactions that she had observed. Indeed, her testimony is unclear about what actually transpired during these "drug transactions," including the specific involvement, if any, of appellants Moore and Bright. *See, e.g.*, Transcript at 188. Moreover, she frequently could not remember the amount of money exchanged or the type and quantity of drugs sold. For example, Smith recalls that Bright visited Moore early in the morning to show him what she described as cocaine; yet, on cross examination she admitted that the substance was not cocaine. *Compare, e.g., id.* at 191 *with id.* at 354. At best, the only marginally probative sections of her testimony concerned a visit to Moore's house by two men for the purpose of buying marijuana and one occasion when she allegedly brought an unidentified man

to Moore's house for the putative purpose of buying drugs. But her knowledge of those incidents stops there. The overwhelming import of her testimony was that she was a sideline observer of some activity that may have involved Moore or Bright in unlawful conduct. Testimony characterized by such significant gaps and inconsistencies is of minimal probative value.

The lack of specificity of the testimony admitted here can be strikingly contrasted with the prior bad acts evidence held admissible in *United States v. Harrison*, 679 F.2d 942, 948 (D.C.Cir.1982), a recent visitation by this court to this area of the law and a case upon which the majority relies. There the witness, who was the wife of the defendant, had observed a continuous course of drug dealing for eighteen months. She testified to all aspects of prior drug deals—the telephone calls concerning drug sales, the weighing of the marijuana, the distribution of marijuana to people who came to their house, and the handling of large amounts of money. Significantly, the witness had participated actively in the drug deals by helping her husband package the marijuana and, once, by counting over $2000 for him. The specificity of her testimony was corroborated by periodic telephone calls over a six month period to police in which she detailed her husband's drug sales. She was also able to direct police to seventeen packages of marijuana in her basement and to a ledger listing names with numbers along side.

In comparison to the detail and depth of Mrs. Harrison's testimony, that of Ms. Smith in the instant case is evanescent.

Smith's knowledge of Moore's and Bright's alleged bad acts, as revealed by her testimony, did not remotely approach Mrs. Harrison's long-term observations of a continuous course of drug dealing. The majority dismisses the differences between *Harrison* and this case as minor. These differences, however, are substantial and directly relate to the probativeness of the bad acts testimony. Indeed, the differences serve to emphasize the fact that the legitimate probative consequences of Smith's testimony are miniscule. Here the jury had to assimilate Smith's contradictory, vague, and confusing statements into a coherent representation of Moore's and Bright's intent to possess and distribute narcotics. The high degree of vagueness in Smith's testimony diminishes the probative value of her testimony to almost zero.

Turning to the prejudice side of the balance, the evidence and the mode of its presentation created a situation ripe for prejudice. Because Smith's testimony consisted of only snippets from separate incidents, and contained no complete description of any single drug transaction, the jury was encouraged to bootstrap inferences upon inferences—to infer as much drug involvement as it desired from this gossamer web of evidence and then, from that, to infer that because of the prior bad acts the defendants were of bad character and thus should be convicted. A jury of laymen, unlimited as to the purpose for which such testimony could be used, could not help but treat Smith's testimony as directly related to the conspiracy *sub judice*, and not just related to the question of intent.*

---

* The majority claims that part of my analysis of the prejudice inherent in Smith's testimony involves an evaluation of witness credibility. *Majority opinion* at 989 n. 45. The criticism is made from whole cloth. The majority confuses an observation that testimony is vague with an attack on a witness' veracity. These are two very distinct concepts. Vagueness goes to the lack of specificity in the witness' testimony; veracity goes to the lack of honesty in the witness' testimony.

In pursuing this misdirected attack, however, the majority has exposed its flank and has revealed the inconsistencies in its analysis. The majority concedes that in applying Rule 403, we

must ask "whether the testimony, accepted as true, sufficiently advances the inquiry to offset any unfair prejudice." *Id.* But by merging questions of vagueness and veracity, the majority sidesteps any real consideration of the fact that Smith's testimony was so filled with gaps that it could play only a "very attenuated role in completing a complex chain of inferences." *Id.* It is beyond me how the majority can state that we must ask whether the evidence advances the relevant inquiry, but that in so asking we must ignore any lack of specificity in the testimony. Under such an approach, any conclusion as to the probativeness of the evidence is sure to be meaningless.

The prejudice also stems, in large part, from the manner in which the evidence was introduced. Our observation in *United States v. Foskey* is equally applicable here:

In reviewing the record, we take into account not only the evidence itself, but also the manner in which it was presented to the jury. The evidence we have culled from the record ... was presented in a disorganized and confusing fashion, raising serious doubts whether its import was even made clear to the jury.

636 F.2d at 524 n. 6. The witness here shifted between testimony concerning the offense charged and testimony concerning past acts. At certain points in her testimony about the crimes at trial, Smith interjected references to defendants' alleged prior drug transactions. *See, e.g.,* Transcript at 224. This movement between past acts and present acts invited the jury to consider prior act and present act testimony equally relevant, and to consider the prior bad acts testimony for more than its limited purpose. As we previously have noted: "Appropriate deference to [the interests sought to be served by the Federal Rules of Evidence] requires the prosecution to conduct its presentation of [bad acts] evidence in a manner *likely to make clear to the jurors the limited purpose for which it is properly admissible.*" *United States v. DeLoach*, 654 F.2d at 772 (Tamm, J., concurring) (emphasis added). The confused and disorganized mode of presentation increased to an unacceptable level the danger that the jury considered the alleged prior bad acts testimony beyond the limited purpose for which it could be admitted.

The context in which Smith's testimony arose is an additional facet in our evaluation of the prejudicial impact of her bad acts testimony. A predominant feature of that context is the fact that conspiracy was the only charge upon which the jury convicted the defendants. As is the case with much complex, multi-defendant, multi-count litigation, conspiracy trials may present a greater danger that the jury will misuse the prior bad acts testimony since the crime of conspiracy and the method of its proof, even without bad acts evidence, tends to be complex and a potential source of confusion for the jury. *See, e.g., Marcante v. United States,* 49 F.2d 156, 158 (10th Cir.1931) (noting in multi-defendant conspiracy case that "with inexperienced jurors, such complicated testimony is too apt to become but a confused jumble, and a verdict too apt to represent an impression that the defendants are guilty of something, with little reference to the crime with which they are charged"). *See generally* P. MARCUS, PROSECUTION AND DEFENSE OF CRIMINAL CONSPIRACY CASES (1983). I find support for this observation in Justice Jackson's statement of almost forty years ago:

The modern crime of conspiracy is so vague that it almost defies definition. Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. It is always "predominantly mental in composition" because it consists primarily of a meeting of minds and an intent.... [E]ven when appropriately invoked, the looseness and pliability of the doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case.

*Krulewitch v. United States,* 336 U.S. 440, 446–49, 69 S.Ct. 716, 720–721, 93 L.Ed. 790 (1948) (Jackson, J., concurring) (footnotes omitted). Here, Smith's vague and inferential bad acts testimony could not help but to aggravate the confusion, complexity, and "inherent dangers" that can be associated, even under the best of circumstances, with a conspiracy charge.

When the minimally probative weight of the prior bad acts testimony is balanced against the prejudice of its vague inferential character and the manner of its presentation, I can only conclude that the prejudice here so clearly outweighs the probativeness that the district court abused its discretion in admitting the evidence. *See, e.g., United States v. Day,* 591 F.2d 861,

879 (D.C.Cir.1978). I would therefore vacate the convictions.

To reach the opposite result, the majority speculates about the impact that a jury instruction would have had *if* one had been given. Somehow able to discern the impact on the jury from a limiting instruction not given, the majority concludes that such an instruction would have cured the prejudice in Smith's testimony. *Majority opinion* at 989–990. I disagree. The majority concedes, as it must, that a limiting instruction will not always overcome the prejudice associated with "bad acts" testimony. *See Majority opinion* at 990 n. 47; *see also United States v. Kaplan*, 510 F.2d 606, 611 (2d Cir.1974); *United States v. Brown*, 490 F.2d 758, 764 (D.C.Cir.1973); *United States v. Bussey*, 432 F.2d 1330, 1334 (D.C.Cir. 1970). In *Bussey*, this court found that the evidence in question was of an insufficient weight to counterbalance its prejudicial impact on the jury. The court therefore held that a cautionary instruction during the general charge to the jury was inadequate to rectify the error caused by the testimony's admission. *Id.* at 1334. So I would hold here. Given the hodge-podge nature of Smith's testimony, it is inconceivable that any limiting instruction could have helped the jury separate the wheat from the chaff.

The majority's *obiter dictum* about the effect of a limiting instruction and what purposes it serves when not given encourages an evasion of our central inquiry: whether the prejudice associated with the introduced "bad acts" testimony outweighs the testimony's probativeness. The majority brushes aside this question with the speculative conclusion that a fictitious instruction would have cured the prejudice. In light of the majority's expansive description of the curative powers of a limiting instruction—paradoxically, even when no such instruction is given—it is difficult to think of that case where the majority would conclude that a limiting instruction could not cure the prejudice. The majority thus comes close to reading Rule 403 out of existence when an instruction is given and, more disturbingly, when the defendant chooses not to seek an instruction. Rule 403 clearly was never intended to have such a limited role.

Rules 403 and 404(b) impose a difficult task on the trial court because evidentiary motions allow little time to reflect on the critical balancing of relevancy and prejudice. Yet, our system of justice relies heavily on the trial court's ability to ensure a fair and accurate presentation to the jury of evidence of the crime charged.

The prosecution has a duty to assist the court in this effort and cannot treat Rules 403 and 404(b) as

> obstacles to be cleared at all costs, even by cutting around corners whenever it is possible to do so. These rules were designed to ensure a defendant a fair and just trial based upon the evidence presented, not upon impermissible inferences of criminal predisposition or by confusion of the issues.

*United States v. Foskey*, 636 F.2d at 525. As was made clear in *Foskey* and *Shelton*, the prosecution, in deciding whether to offer prior bad acts evidence, must make its own first cut to screen out such bad acts testimony as cannot pass the balancing test. Unlike a civil trial, where counsel for both sides can fairly safely offer the judge any evidence he will accept, a criminal trial imposes the need for self-restraint on the prosecutor; he or she may not look for ways to lessen the primacy of the principle that a defendant is to be convicted for the activity described in the indictment, rather than character and prior conduct. Here, the prosecution used no such restraint.

### III. Conclusion

For the reasons above, I would vacate the convictions and remand for a new trial on the conspiracy charges. I therefore must respectfully but vigorously *dissent.*